1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE SOUTHERN DISTRICT OF TEXAS

3                              HOUSTON DIVISION

4    PATRICIA KRAFT                §       CASE NO. 4:20-CV-04015
                                   §       HOUSTON, TEXAS
5    VERSUS                        §       THURSDAY,
                                   §       DECEMBER 9, 2021
6    TEXAS A&M UNIVERSITY ET AL    §       10:30 A.M. TO 11:38 A.M.

7                              MOTION HEARING

8                  BEFORE THE HONORABLE CHARLES ESKRIDGE
                      UNITED STATES DISTRICT JUDGE

9

10

11   APPEARANCES:                          SEE NEXT PAGE

12   ELECTRONIC RECORDING OFFICER:    DISA MCKINNIE-RICHARDSON

13   COURTROOM CLERK:                 JENNELLE GONZALEZ

14

15

16

17

18

19

20                     TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                       935 Eldridge Road, #144
22                     Sugar Land, TX 77478
                          281-277-5325
23              mary@judicialtranscribers.com

24

25       Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

1                              <u>APPEARANCES</u>:

2

3   FOR THE PLAINTIFF:              ROBERT G. TAYLOR, III
                                    ATTORNEY AT LAW
4                                   2040 NORTH LOOP WEST
                                    SUITE 104
5                                   HOUSTON, TX 77018
                                    713-654-7799
6

7

8
    FOR THE DEFENDANT:             CYNTHIA OGHENOVO AKATUGBA
9                                   OFFICE OF THE ATTORNEY GENERAL
                                    P.O. BOX 12548-CAPITOL STATION
10                                  AUSTIN, TX 78711
                                    512-463-2120
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     **HOUSTON, TEXAS; THURSDAY, DECEMBER 9, 2021; 10:30 A.M.**

2        THE CLERK:  All rise.

3        The United States District Court for the Southern

4 District of Texas is now in session.  The Honorable Charles

5 Eskridge presiding.

6        God save these United States and this Honorable

7 Court.

8        THE COURT:  Thank you.  Everybody can be seated.

9        All right, I call Kraft versus Texas A&M

10 University, Civil Case 20-04015.

11        Can I get appearance of Counsel, please?  You may

12 remove your masks if you would like to.

13        MR. TAYLOR:  Your Honor, my name is Robert G.

14 Taylor, III.  I'm here on behalf of Patricia Kraft.

15        THE COURT:  All right, thank you.

16        MR. TAYLOR:  I go by, my nickname is Trey Taylor,

17 Your Honor.

18        THE COURT:  I will call you, Mr. Taylor, but thank

19 you, sir.

20        And for Defense?

21        MS. AKATUGBA:  Cynthia Akatugba on behalf of

22 Defendant Texas A&M University.

23        THE COURT:  All right, thank you.

24        And who do you have here with you?

25        MR. SILVER:  I'm Tom Silver.  I'm an attorney with

1 the Texas A&M University System, Office of General Counsel,

2 Your Honor.

3          THE COURT:  All right, thank you.

4          That is one question I had coming off of the last

5 hearing.  I'd asked you all to discuss the stipulation to

6 support the dismissal of at least the Defendant Texas A&M

7 University System.  Doesn't look like that was done.

8          What was the nature of those conversations, if

9 any?

10          MR. TAYLOR:  Your Honor, I believe we did have an

11 initial conversation.  Frankly, I'm not sure, we just didn't

12 follow up and I apologize --

13          THE COURT:  That's okay.

14          MS. AKATUGBA:  Well, my understanding was when he

15 filed the Amended Complaint, there were no more claims

16 brought against the System.  So, the only things brought are

17 against the University.

18          THE COURT:  Okay.  So, is it actually -- so, it

19 hasn't been -- well, let me ask this then.

20          Can I formally dismiss it off of the case?

21          MR. TAYLOR:  You may, Your Honor.

22          THE COURT:  All right.  So, it remained on the

23 docket.  That sounds great.

24          Okay.  So, the Defendant Texas A&M University

25 System will be dismissed from this action with prejudice,

1  but that doesn't take any action as to Texas A&M University

2  itself.

3        All right.  So, let's turn to the Motion to

4  Dismiss that we have pending, and I know it's your motion.

5  I kind of approach arguments this way, Ms. Akatugba.  I'm

6  inclined to let the case on the papers.  I see this case.

7  It has to go forward for at least some discovery as to

8  whether he is a supervisor.  I think that in your reply

9  brief, you even indicate, well, you're not opposing

10  discovery as to that.

11        Am I remembering the papers correctly there?

12        MS. AKATUGBA:  Yes, Your Honor, but I have a

13  tentative argument that we still have to rule that they have

14  alleged a hostile work environment --

15        THE COURT:  Right.

16        MS. AKATUGBA:  -- and on the facts, here, they

17  haven't alleged --

18        THE COURT:  And I want to talk about that, which

19  is the main focus of my argument.  Actually, let me ask

20  Mr. Taylor one question before we get going here.  Where do

21  I have my elements set out?

22        So, at issue today, as I understand it, we've got

23  five elements of this hostile work environment claim and we

24  are not here arguing about whether or not Patricia Kraft was

25  a member of a protected group, was subjected to unwelcome

1  sexual harassment, or that the harassment was based on sex.

2  I don't believe I've seen that put at issue.

3        Am I correct?  And Mr. Taylor, that would be, I

4  think, for you, you're not joining issue as to those.

5        So Ms. Akatugba, you haven't put any of those

6  elements as --

7        MS. AKATUGBA:  Yes, we haven't put that at issue

8  but --

9        THE COURT:  And I'm not saying that that's a

10  stipulation about later.  I'm saying for purposes of your

11  Motion to Dismiss.

12        MS. AKATUGBA:  Yeah, for purposes of a Motion to

13  Dismiss in this case though, because of the unique facts at

14  issue, I think Element No. 2, she was subject to unwelcome

15  sexual harassment, is very tied in with that Element No. 4

16  about whether the harassment was pervasive in severe or not.

17  So, I don't know that I'd necessarily be able to say, well,

18  that's not at issue.  I do think that the Court will still

19  have to kind of reach that element because that goes to the

20  idea of subjective and objective reasonability of whether

21  the environment was hostile in reaching Element No. 4.

22        THE COURT:  Okay, Mr. Baty has been now, not

23  personally served, but served by other means.

24        Is that correct?

25        MR. TAYLOR:  If I may, Your Honor, I --

1          THE COURT:  And just bring me up-to-date about all

2  that, yeah.

3          MR. TAYLOR:  Initially, before we filed last week,

4  we've had process servers leave the process at Mr. Baty's

5  last known residence.  We checked with the --

6          THE COURT:  Well, what do we know about his last

7  known residence?  Is anybody there now?  Is it hard to tell?

8          MR. TAYLOR:  His car has been there.  There's one

9  car that's still registered in his name.

10          THE COURT:  That's still --

11          MR. TAYLOR:  Apparently, I don't know if it's

12  moving or not.

13          THE COURT:  Okay.

14          MR. TAYLOR:  I've not been out there, of course.

15          THE COURT:  Oh, yeah.

16          MR. TAYLOR:  The process server did this back in

17  July, I believe.  They left this process on the door,

18  affixed.  They've been back and forth.  That car has moved

19  at one point in time at least --

20          THE COURT:  Okay.

21          MR. TAYLOR:  -- since they've been going out

22  there.

23          THE COURT:  You've also emailed the process, I

24  believe, right?

25          MR. TAYLOR:  After we sought permission from the

1   Court --

2          THE COURT:  Yeah.

3          MR. TAYLOR:  -- we have emailed the process.  We

4   have mailed the process for certified and returned.  The

5   certified did get returned unclaimed as I expected it would.

6   However, the other letter did not come back.

7          Additionally, there was service through the online

8   services of Facebook and LinkedIn, which are two different

9   social media sites where he maintains an account.  One of

10  them, Facebook, in particular, I think, in our motion, it

11  actually had a picture of him, and I think LinkedIn did,

12  too, but I don't know, but I know that both of those were

13  done by the process server.  We submitted an affidavit with

14  notice and what have you --

15         THE COURT:  Okay.

16         MR. TAYLOR:  -- to the Court.  I don't know how

17  else to reach him.  Oh, one other thing we did, although his

18  lawyer on the criminal matter said he was not able to accept

19  service, we went ahead and served his lawyer also through

20  email.

21         THE COURT:  Okay.

22         MR. TAYLOR:  So, if nothing else, his lawyer can

23  give it to him.  I'm not relying on that here because the

24  lawyer did not agree to accept service --

25         THE COURT:  Okay.

 1          MR. TAYLOR:  -- but I did want to let the Court

 2  know we've done that.

 3          THE COURT:  All right, thank you.

 4          And so, the Notice of Service that you provided to

 5  me at Docket 54 was filed December 3rd.

 6          So, having undertaken all of that, he's not

 7  reached his answer or otherwise responsive pleading date,

 8  right?

 9          MR. TAYLOR:  Not yet, Your Honor, and --

10          THE COURT:  And you haven't heard from him or

11  civil counsel on his behalf?

12          MR. TAYLOR:  I have not.

13          THE COURT:  Okay.  All right, thank you.

14          MR. TAYLOR:  I just wanted to let the Court know

15  those were, the process that we're talking was undertaken in

16  I think around November 10th or 13th.  We just filed the --

17          THE COURT:  Oh, okay.  So, actually, his dates may

18  be passed and we haven't heard from him.

19          MR. TAYLOR:  And I don't mind waiting an extra, if

20  the Court's agreeable, we can wait an extra period of time

21  from the date we filed notice if we want to solid date where

22  we know --

23          THE COURT:  For what?

24          MR. TAYLOR:  For him to respond.

25          THE COURT:  For him to respond?  I would just

1  leave it at this.  It sounds like he's passed this answer

2  date.  We'll see if he does respond.  I think you're

3  probably expecting that he might not ever respond and so you

4  can move for your default judgment, you know, according to

5  the rules when appropriate, whenever you'd like.

6          MR. TAYLOR:  Yes, Your Honor, and you know,

7  frankly, I would like to have his testimony, but I'm

8  thinking that's going to be very difficult to obtain,

9  especially prior to him dealing with his criminal matter.

10          THE COURT:  Well, with the criminal matter, I

11  think even if you got him served with a subpoena, it would

12  just the 5th, at this point.

13          MR. TAYLOR:  Yes, sir.

14          THE COURT:  Okay, all right.

15          Ms. Akatugba, how many actions is Texas A&M facing

16  of a civil nature based on Mr. Baty's conduct?  There's this

17  one and are there others?

18          MS. AKATUGBA:  I know of one more in the EEOC.  I

19  don't know the status of that matter.  This was when this

20  case was first filed.

21          THE COURT:  But just one other perhaps?

22          MS. AKATUGBA:  One other one that was perhaps

23  going through the EEOC process, but --

24          THE COURT:  Okay.  So, this is not a great number

25  of people -- I just had no idea whether dozens had filed or

1  whether this is just --

2        MS. AKATUGBA:  No, Your Honor.  So, no other cases

3  have been filed.

4        THE COURT:  Okay, all right.

5        All right.  So, let's talk about the Motion to

6  Dismiss and on the question of whether it was sufficiently

7  severe or pervasive.

8        It can be -- it's one or the other, right?  It's

9  either that it was pervasive or it was severe.  It doesn't

10  have to be both.

11        MS. AKATUGBA:  That's correct, Your Honor, but the

12  way you assess that element is you look at objectively and

13  subjectively, and in this case, I think the argument we've

14  put forth, but it also applies in the objective standard is

15  that subjectively she was not aware of the harassment.  So,

16  your work environment cannot be hostile when you look back

17  retrospectively if it was not hostile at the time.  That

18  would create imposed certain responsibilities on employers

19  that are not required by law.  So --

20        THE COURT:  I think that that's true if it's past

21  conduct that never affected the person in the first place.

22  But on this, you're not aware of a hidden camera in the

23  women's restroom presumably pointed at an area where clearly

24  it would be embarrassing, to say the least.  And then, when

25  it is found and you become aware of that, you are suddenly

1 aware of something very severe that happened and that it was

2 also, in that sense, pervasive.  You become aware of the

3 fact of what was going on and what you were experiencing

4 over -- do we know how long a period of time?  Is that just

5 not something that's been revealed yet?

6          MS. AKATUGBA:  That's not been revealed yet.

7          THE COURT:  Yeah, I don't know that that's

8 something discernible from like what's been gathered at this

9 point.  But it is a camera there and I think that it would,

10 any reasonable person, any reasonable woman would be very

11 disturbed to learn after the fact that there's been this

12 camera in the women's restroom.  This is entirely a separate

13 question from whether or not Texas A&M, itself, is

14 responsible for it or knew about it, or et cetera.

15          MS. AKATUGBA:  And you know, there's no question

16 about that, if anybody after the fact --

17          THE COURT:  Yeah.

18          MS. AKATUGBA:  -- looking back in this environment

19 would be disturbed by it, right?  But the purpose of Title 7

20 and the purpose of this statute is to impose on employers an

21 affirmative obligation to create a workplace environment

22 that's friendly to women, and this obligation and this legal

23 obligation under Title 7 cannot be based on actions that the

24 employer has no oversight over because if she was aware of

25 the camera, she could have reported it, she could have filed

1  a Complaint.  These are processes within the Title 7

2  framework that would allow for a remedy and allow the

3  employer to take action.  And I think this case is

4  particularly important because it was in the only women's

5  restroom.  So, women supervisors, including Mr. Baty's

6  supervisors, were using that restroom as well.  And so, they

7  would obviously have a very high interest if they knew about

8  the camera --

9          THE COURT:  Oh, of course.

10         MS. AKATUGBA:  -- to address the issue.  And so,

11  here, I think an analogy that may be inappropriate given the

12  circumstances here, but here's an analogy.  You have two

13  people in the work environment who were having a consensual

14  relationship -- and nothing that happened, in this case, is

15  consensual; this is just a hypothetical --

16         THE COURT:  Right, okay.

17         MS. AKATUGBA:  -- they're having a consensual

18  relationship, but then they go through a very messy breakup

19  and then the woman comes back or the man comes back into the

20  work environment and suddenly, the breakroom that used to be

21  a happy room where they could go is now tainted with

22  memories of this failed relationship.  And in retrospect,

23  those memories are horrible, but at the time, it was not a

24  hostile work environment and I think that's what's important

25  in this case, it's that we would be setting a whole new rule

1  that employers be questioned about things that are going on

2  in the work environment that would require them to take

3  invasive measures to discover in order to prevent people

4  from feeling bad in the future after they've taken remedial

5  action.

6          THE COURT:  That starts moving it along to the

7  fifth factor, in my mind, what the employer knew or should

8  have known.  I think when we're looking at Factor 4, at this

9  stage, I'm looking at it with the idea that, as alleged, he

10  was her supervisor.  And so, as I understand that, if that

11  pans out -- I think there are reasons why discovery might

12  show that that won't pan out.  But if that did pan out, the

13  fact that he is the supervisor kind of makes it the

14  employer's conduct in the first instance and makes it

15  naturally problematic.

16          MS. AKATUGBA:  But the Fifth Circuit has not

17  applied the objective and subjective reasonable person

18  requirement to that fifth factor.  They've applied it to the

19  fourth factor.

20          THE COURT:  Uh-huh.

21          MS. AKATUGBA:  And I think that's what's different

22  here is that the fourth factor requires it to alter the

23  conditions of your employment.  So, you have to be aware of

24  it in order for it to have altered the conditions of your

25  employment and it has to be in that present --

1          THE COURT:  What do you mean by "alter the

2  conditions of the employment" --

3          MS. AKATUGBA:  Well, I think, alter the conditions

4  of --

5          THE COURT:  -- because I would say this arguing

6  back at that, at the moment that you become aware that that

7  camera was there -- let's say that you also learned that it

8  had been there for 3 months -- your conditions of

9  employment, you realize, suddenly included the fact that

10 your supervisor could watch you undress as you went to the

11 bathroom each day.  That's not okay.

12         I understand -- and I'm not disparaging your

13 argument.  I'm just sort of -- you're looking at it from the

14 point of time that it was discovered and Texas A&M took the

15 right action, obviously, in removing it, investigating him,

16 terminating him, I assume it's all going to show -- it's all

17 -- I don't know what the evidence will show.  I assume it's

18 ultimately going to show.  I assume it's ultimately going to

19 show that, you know, Defendant Baty was actually the one

20 responsible for it, et cetera.  So, Texas A&M, as a

21 responsible employer, did that.

22         But that still -- you still have whatever period

23 of time is that that's before where something -- no

24 reasonable person would be agreeing to begin employment

25 knowing that that's something that they were going to be

1  subjected to.  If you were told -- what was her job, by the

2  way, Ms. Kraft?

3          What kind of job is it here?

4          MR. TAYLOR:  She was a driver in the

5  transportation department.

6          THE COURT:  That's what I thought, okay.

7          So, you're hired as a driver in the transportation

8  department.  That means that you're going to have to clock

9  in at 8:00 and you'll work till 5:30 each day, and you may

10 need to drive up to 100 miles a day, and by the way, your

11 supervisor's going to watch you when you go to the bathroom.

12 So, would you like to join us?  No person's going to say,

13 "Sure, I'd love that job."

14         MS. AKATUGBA:  And no employer would say that's

15 part of the job requirement or say, "This is the environment

16 to which you're signing up for."  Title 7 specifically

17 prohibits that type of environment --

18         THE COURT:  Uh-huh.

19         MS. AKATUGBA:  -- and asks employers to take

20 actions to prevent it.

21         THE COURT:  Yeah.

22         MS. AKATUGBA:  But here, the issue is, if this

23 case is allowed to proceed, there's the implicit rule that

24 employers should search for hidden cameras when there's no

25 other evidence that suggested there was a hidden camera, and

1  there's no allegation here that she complained about a

2  hidden camera or the possibility of a hidden camera, or that

3  anybody complained about the possibility --

4           THE COURT:  Sort of.  I hear what you're saying,

5  but I also sort of look at it as, you know, or actually the

6  System's obligation is to make sure that you don't hire

7  supervisors who are going to do that type of thing.

8           MS. AKATUGBA:  Based on the allegations in this

9  Complaint, nothing points us to a connection between

10  Mr. Baty's actions and that he would take that kind of --

11           THE COURT:  Uh-huh.

12           MS. AKATUGBA:  -- I mean, this is criminal

13  activity.

14           THE COURT:  And again, I'll have discussion with

15  Mr. Taylor that overall, I think, Plaintiff's case as

16  against Texas A&M University is pretty thin.  But for me,

17  that's just a different question than whether it needs to go

18  forward past the pleading stage.  I mean, we've got

19  unquestionably severe -- I mean, nobody tries to argue, "Oh,

20  well, this isn't that big a deal."  Nobody's trying to say

21  that.

22           MS. AKATUGBA:  Yeah.

23           THE COURT:  And so, then it's just sort of --

24  honestly, for me, it's what's the right procedural posture

25  by which I can then assess what actually happened *vis-à-vis*

 1  Title 7 standards, in a way that will also satisfy the Fifth

 2  Circuit when they take a look at it.  And I thought about --

 3  and I will tell you, I've thought about how do I write this

 4  to say that, as to the fourth prong, the camera that was

 5  found and what was known there wasn't sufficiently severe or

 6  pervasive in the context that those words are used.  It's

 7  hard to articulate and not actually be saying something that

 8  becomes sort of like, of me saying, "It's not that big a

 9  deal.  It's just not that severe," and it's like it is

10  severe.

11         MS. AKATUGBA:  Yeah, but I think the way to do

12  that -- and this is, you know, where the Fifth Circuit has

13  really, maybe unlike other circuits, drawn a line about what

14  a hostile work environment is.  A hostile work environment

15  has to rise above that you look back in time and it's

16  hostile.  And I think this is --

17         THE COURT:  It does not sound to me like

18  generally what's going on in that office is hostile.  I

19  mean, it just doesn't read like, "Oh, it's hostile."

20         MS. AKATUGBA:  But if it's not, then that is the

21  only moment in time --

22         THE COURT:  Exactly, but --

23         MS. AKATUGBA:  -- that the employer can be

24  assessed.

25         THE COURT:  I agree, and it's -- when I look at --

1  it's unwelcome sexual harassment in Factor 2 and 3,

2  sufficiently severe and pervasive.  I don't know that -- I

3  mean, I talk about this camera as, okay, well, it was

4  pervasive for the time that it was there.  But even going

5  with your argument, though, it was like it was a one point

6  in time type thing.  And so you need to look at it in a more

7  -- that makes it so that it's not pervasive in the way that

8  in an office, itself, and the environment is.  There's lots

9  of little disparaging things that are going on, like over a

10  great period of time that become intolerable.  As opposed to

11  here, you've got one great, big thing that nobody agrees a

12  woman should be subjected to in the workplace has happened.

13          MS. AKATUGBA:  She should subjectively be aware of

14  this.

15          THE COURT:  Yeah.

16          MS. AKATUGBA:  And objectively, any woman in that

17  workplace could be aware of it --

18          THE COURT:  And that's what I'm wrestling with --

19  that's what I wrestle with is she became subjectively aware

20  of it and in retrospect, she's thinking about it.  And I

21  have a hard time drawing that line that she can't, assuming

22  that he's her supervisor, that she can't be unsettled in a

23  way within the ambit of Title 7 upon learning that that has

24  been happening, but that doesn't reach the Title 7 concerns.

25          Let me ask this, because in reply you had the

1  *Cottrell v. MFA* case from the Eighth Circuit.

2           Do you have that in mind?

3           MS. AKATUGBA:  I do.

4           THE COURT:  Okay, was that on Motion to Dismiss or

5  Motion for Summary Judgment?

6           MS. AKATUGBA:  I believe that was on Motion for

7  Summary Judgment.

8           THE COURT:  See, because I read that case and it's

9  my one question.  I'm sort of like -- I think I might

10 eventually agree with what the Eighth Circuit's saying here,

11 and my question is I wonder if that's on Motion to Dismiss

12 or Motion for Summary Judgment.

13          MS. AKATUGBA:  I would say the way that case has

14 been distinguished by, you know, other case who refuse to

15 follow that case, for example, is that one of the basis for

16 the allegation going forward in *Cottrell* was because after

17 the peephole was discovered, the woman volunteered to act as

18 bait so they could catch him in the act.

19          THE COURT:  Yes.

20          MS. AKATUGBA:  And so, she had this extra incident

21 after the discovery of the peeping hole.  And so, the Court

22 said, "And you volunteered for this and this at this point."

23 So, that fact needed to be developed in that case.  There

24 was no dispute there was a peephole.

25          And going back to the Title 7, I think one way to

1   phrase this case is --

2          THE COURT:  The thing about it is, though, if it's

3   -- these are unfortunately interesting fact patterns on the

4   -- when this camera was discovered, as I understand it, the

5   University was already looking at security footage and you

6   see that Baty is going in, like, without an explainable

7   reason why was he in the bathroom and stuff.  So, you're

8   pretty much on to it.

9          With the peephole, it's sort of, I mean, that's

10  like that's only being used when a person is like on the

11  other side of the peephole looking through.  So, you do

12  actually need to find the person there.  And in some ways,

13  you could sort of say, yes, you would then need to have

14  someone lure him into doing that.

15         On the other hand, I read the fact pattern as sort

16  of like, you know, why don't you establish your own camera

17  on the other side of the peephole to figure out who's using

18  it that way?  But then you are leaving unsuspecting people

19  to be the ones that might be subjected to it again.  There's

20  not a good way to figure out who's going these things

21  without exposing -- so to say that she -- to say that she --

22  "Oh, she volunteered," and stuff like that, it's sort of

23  like.

24         The other point is you kind of need somebody's

25  consent.  Otherwise, you're just letting people, you know,

1  run into the line of fire.  It's like, "Oh, we weren't

2  worried about the last couple of times, but we needed to

3  have somebody do it so we could nail this person."  Very

4  hard facts, obviously.

5          Go ahead.  I cut you off.

6          MS. AKATUGBA:  I think, going back to, you know,

7  your comments about the ambit of Title 7, I think, here, the

8  relevant time period is the discovery of the camera and

9  Ms. Kraft continued to work for the University, I think, for

10 months after.  So, the camera was discovered in May.  She

11 eventually left in September and part of the allegations in

12 the first Complaint is that, you know, she felt very

13 uncomfortable and unsafe in this environment,

14 understandably, but I think one way to look at this is to

15 say, "Okay, from the discovery of the camera until when she

16 left, was it a hostile work environment?" and if the answer

17 is no --

18          THE COURT:  Yeah.

19          MS. AKATUGBA:  -- then that's it.

20          THE COURT:  Uh-huh.

21          MS. AKATUGBA:  And so, I think the idea that like

22 somehow, "Well, she feels bad looking back on her

23 employment," there is nothing the employer can do about that

24 and the point of Title 7 is to impose obligations on

25 employers and rules to train their employees and train

1  supervisors, and here, you just don't get that rule of

2  decision at the of the day.  But I do think there's

3  something to be said for saying between May 2020 and

4  September 2020, when the camera was discovered and she

5  continued to work in the environment, was it a hostile work

6  environment, and if the answer to that is no, it was not, --

7              THE COURT:  Uh-huh.

8              MS. AKATUGBA:  -- then that ends that case.

9              THE COURT:  So, she began -- I'm just trying to

10  line up the dates.  She began her employment in May of 2017

11  and the camera was May of 2019.

12              Is that right?  It's easy to blur time.

13              MR. TAYLOR:  Yes, Your Honor.

14              MS. AKATUGBA:  Yes --

15              THE COURT:  Okay

16              MS. AKATUGBA:  And the forget the pandemic.

17              THE COURT:  So, she was there for two years before

18  the camera was found and then she was there for another

19  seven months after it was found, right?

20              All right, there was sort of the factual dispute,

21  could I look at it, could I not, as to what was in the EEOC

22  Complaint.

23              MS. AKATUGBA:  Yes, Your Honor.

24              THE COURT:  Was that as to -- as I understood

25  that, you were introducing it and whether it's by judicial

1  notice or that it's fairly within the four corners of the

2  Complaint.  You wanted me to look at that in terms of she's

3  not making some of these arguments in her EEOC Complaint.

4          Is that right?

5          MS. AKATUGBA:  Correct.

6          THE COURT:  And is that a bar -- but then I don't

7  read that as a further argument saying it was unexhausted or

8  it was some sort of bar.

9          What was I supposed to be making of her EEOC?

10         MS. AKATUGBA:  The making of it is the scope of

11 the allegations that are properly before this Court on a

12 hostile work environment claim.  The point of an EEOC charge

13 is to give the Respondents, and to give the EEOC the

14 opportunity to investigate and say, "Is this an employer

15 where we have a situation that needs to be addressed?"

16         And so, when you go to the EEOC and you say a

17 camera was discovered in the bathroom, the EEOC goes to the

18 Respondent and the Respondent says, "We found the camera, we

19 called the police within the hour, that employee never

20 showed up again."  The EEOC rightly stopped its

21 investigation there.  And so, now, to be in Court and to be

22 subject to allegations going back to 2014 involving other

23 persons that were not properly before the EEOC --

24         THE COURT:  Well, I understand that argument about

25 what happened possibly before she even began employment.

1  That doesn't carry much meaning to me.

2         So, her EEOC Complaint, which I haven't looked at,

3  what was the nature of her Complaint there?

4         MS. AKATUGBA:  The nature of her Complaint was the

5  discovery of the camera and --

6         THE COURT:  It was just the camera?

7         MS. AKATUGBA:  It was just the camera and --

8         THE COURT:  But none of this other things about

9  him staring at her and making her uncomfortable that we see

10  in the Complaint, but it was as to the camera and at the

11  time that the charge was brought, the EEOC charge, the

12  camera had obviously already been removed?

13         MS. AKATUGBA:  Correct.

14         THE COURT:  Okay, okay.

15         MS. AKATUGBA:  And I think, she was upset or you

16  know, my reading of it is more about that she continued to

17  work in this environment without further assurances from A&M

18  about the environment she was working in.

19         THE COURT:  Okay.

20         Mr. Taylor, as to the fifth fact, the employer

21  knew or should have known and failed -- of the harassment

22  and failed to take prompt remedial action, how are you -- if

23  I have to get to the fifth factor because Baty is found as a

24  matter of law not to be the supervisor, how are you possibly

25  going to meet the fifth element?

1          MR. TAYLOR:  So, you're saying with the exception

2   of Baty not being the supervisor?

3          THE COURT:  Exactly.

4          MR. TAYLOR:  Your Honor, that's part of what I

5   believe we can show through discovery, but I've also put

6   pleadings in here, is that this person, Mr. Baty, had a

7   history and pursuant to everything I've seen so far, it was

8   a constant, you know, not just my client, but other women in

9   the area were being subjected to different types of sexual

10  harassment, different comments.  You read it in the

11  pleadings.  I mean, it talks about my client started

12  wearing --

13         THE COURT:  So, you're saying items in his past

14  history of employment overall contribute to the knew or

15  should have known?

16         MR. TAYLOR:  Yes.  Yes, Your Honor, and also, it's

17  in the same realm.  I think there is --

18         THE COURT:  Okay, you've heard what I've had to

19  say about the camera, that I find the camera very

20  concerning.

21         What is the next most concerning thing you have

22  identified to this point in his work history?  If you had to

23  pick the one next thing that you think is the absolute worst

24  that he's done that you've legitimately heard about, what is

25  it?

1          MR. TAYLOR:  Okay, with regards to my clients in

2   particular or --

3          THE COURT:  Actually, give me one of each.  As to

4   your client in particular, which I've seen your pleading as

5   to that and it's like staring at her and making her

6   uncomfortable.  I'm not saying that that's okay, --

7          MR. TAYLOR:  Yes, Your Honor.

8          THE COURT:  -- but it was no touching and it was

9   no like aggressive words or anything like that, right?

10          MR. TAYLOR:  To the best that my client has been

11   able to tell me at this point.

12          THE COURT:  Okay.

13          MR. TAYLOR:  With regard to -- and you know,

14   trying to look down her shirt, stuff like that.

15          THE COURT:  Things like that, and I understand

16   that.

17          So, as to others, and that's fairly characterized

18   in the work environment, what's the next worst thing?

19          MR. TAYLOR:  One example that my client raised was

20   him taking all the female receptionists out vehicles.

21   Basically, the pretty girls got to go out and drive the

22   busses and they weren't qualified to even be on them.  There

23   was that kind of favoritism towards the ones who would flirt

24   with him.  So, that would be the other ones.

25          THE COURT:  Okay.

1          MR. TAYLOR:  And well, one other thing, Your

2   Honor, and that's the other thing is his constant, which is

3   not necessarily sexual, but he would constantly joke around

4   or threaten to write people up, which was a means of causing

5   damage to their work record possibly.

6          THE COURT:  Okay.

7          MR. TAYLOR:  And one other point, if I may

8   respond?

9          THE COURT:  Those are -- I see, anything that your

10  client is saying, "Here's what he did to me," that's fair

11  game for me to consider.

12         MR. TAYLOR:  Yes, Your Honor.

13         THE COURT:  What it's then what are others that

14  were in the work environment saying are things that he did,

15  are the types of things that you're saying, even if those

16  are true, I'm not sure that that -- what you -- you'd have

17  to connect it to the type of harassment that Ms. Kraft was

18  subjected to in the knew or should have known sense, and I

19  don't see that anything that you just articulated says,

20  "Well, the University ought to have suspected that he had a

21  camera in the women's restroom."  Those don't logically

22  follow from each other.

23         MR. TAYLOR:  Your Honor, I think that most of what

24  I just talked about, not all of it, of course, but most of

25  it, Ms. Kraft witnessed herself.  So, she would be able to

1    tell you what she saw.

2             THE COURT:  Uh-huh.

3             MR. TAYLOR:  But I think that the favoritism and

4    the, I guess, the objectification of women instead of men in

5    this situation is what would lead to someone, you know -- I

6    don't know if it'd lead to --

7             THE COURT:  At that point, I'd be looking at Fifth

8    Circuit precedent very closely apart from what I think about

9    it in any way, shape, or form.

10            MR. TAYLOR:  Yes, Your Honor.

11            THE COURT:  From you all's briefing, particularly

12   from the state's briefing, in parentheticals summarizing

13   what's been found to be, not necessarily that it's okay, but

14   not problematic enough under the law that we're talking

15   about right now.  Some of the parentheticals which I assume

16   are being accurately cited to me indicate more severe

17   conduct than what you're talking about right now.  Okay.

18            And Mr. Taylor, you said you had one other thing

19   you wanted to say in response?

20            MR. TAYLOR:  I just wanted to make a quick note or

21   two quick notes.  One, regarding the May to August period or

22   the May to September period, which my client remained at the

23   University, there was a big difference, and that was

24   Mr. Baty wasn't there anymore.

25            So, as far as her staying on, it seemed to be that

1  they were saying there's no case there.  Well, if you

2  eliminate the person that was initially causing the problem,

3  then that makes sense.

4          THE COURT:  Why did she leave her employment?

5          MR. TAYLOR:  Frankly, I can't recall why she

6  terminated her employment.  I think it was mainly because

7  she didn't want to be around there anymore.

8          THE COURT:  And she was not terminated.

9          Is that --

10          MS. AKATUGBA:  She was not terminated.

11          MR. TAYLOR:  No, she quit, Your Honor.

12          THE COURT:  Okay, she quit.

13          And was she in the midst of disciplinary

14  proceedings in any way or anything?  She just -- it's fine.

15  People can decide to leave their employment.  I'm just

16  trying to understand.

17          She just decided that she was leaving?

18          MR. TAYLOR:  Yes, your Honor.

19          THE COURT:  Okay, all right.

20          MR. TAYLOR:  I would have to go and ask her

21  specific without --

22          THE COURT:  No, I guess, my real question -- I

23  just wanted to make sure.  I figured I would have seen it in

24  the Complaint, if she said, "I'm leaving because this

25  happened to me, this camera incident, and that's the reason

1  that I'm leaving."

2         MR. TAYLOR:  That's a big part of why she left

3  but --

4         THE COURT:  Okay.

5         MR. TAYLOR:  But there was --

6         THE COURT:  That easy to say but it was not so

7  easy to plead, and it's not in the pleadings that way.

8         Is it, sir?

9         MR. TAYLOR:  I don't believe so.

10         THE COURT:  Okay, thank you.

11         MR. TAYLOR:  I do believe that she attended a

12  couple of sessions afterwards, and I did put in the

13  pleadings that the University had indicated that there was

14  Title 7 claim attempting -- apparently attempting to

15  encourage people not to pursue any action, Title 9 claim, I

16  mean.  Sorry, not Title 7.  They made that there was

17  representations to that effect in these sessions they had by

18  the end of the case.

19         Additionally, Your Honor, I believe, it is a very

20  large computer files full of pictures, pictures and video,

21  but I believe the police indicated that they expected him to

22  have been doing it for at least a year.

23         THE COURT:  Okay.

24         MR. TAYLOR:  That's the number I've been working

25  from, and I mean, gigabytes of information, which contain

1    massive number, hours and hours and hours of video, so.

2             THE COURT:  And where are his -- in terms of

3    timing, his criminal proceedings are at what stage, at this

4    point?

5             MR. TAYLOR:  Every time I check, Your Honor -- and

6    I have talked to Mr. Phelps, who is his criminal defense

7    lawyer.  That last time I checked, which I just checked the

8    Court's docket over there, I think it's been reset again.

9    It keeps getting reset.

10            THE COURT:  Okay.

11            MR. TAYLOR:  But they're trying to get a trial

12   set.

13            THE COURT:  All right.

14            MR. TAYLOR:  He's pled not guilty.

15            THE COURT:  All right.

16            Ms. Akatugba?

17            MR. TAYLOR:  They've only filed five.

18            THE COURT:  Say again.

19            MR. TAYLOR:  They've only filed five Complaints or

20   Petitions, charges for each is a felony, and my client is

21   one of the victims or complaining witnesses.

22            THE COURT:  All right, thank you.

23            Anything further for the State?

24            MS. AKATUGBA:  No, Your Honor, I think Fifth

25   Circuit precedent is very clear that the hostile work

 1  environment claim cannot be a civil RICO and certainly,

 2  cannot impose on employers to be questioned about what's in

 3  the environment.  And I think in this case, in particular,

 4  you have an individual who, by all accounts, admittedly was

 5  a person who had trouble socialization, but for the most

 6  part, his job performance was okay.  And so, to say that

 7  because he had these incidents that were perhaps

 8  inappropriate or showing favoritism to some women, the

 9  University should be aware that there could be a camera in

10  the bathroom -- and how would the University go about being

11  aware of that without, you know, monitoring the bathroom in

12  the way in the way Mr. Baty was.

13            THE COURT:  Uh-huh.

14            MS. AKATUGBA:  I mean, I just think this is one of

15  those cases were as severe and as horrible as this has been,

16  I'm sure it is thinking retrospectively from the Plaintiff's

17  perspective, it just is not a hostile work environment as

18  Title 7 imagines it.

19            THE COURT:  Okay.

20            MS. AKATUGBA:  Thank you.

21            THE COURT:  All right, thank you.

22            Ms. Akatugba -- I'm sorry that I'm having a hard

23  time with your last name -- very well argued, and I think,

24  as I've said, I think it may persuade me at a later juncture

25  on summary judgment, but I do think the case, as pleaded,

1  gets past the Motion to Dismiss stage.  I look at -- I did

2  not bring up the case. but it's just sort of setting the

3  factors, it's in your brief for A&M -- *Alanis v. Anora*

4  *Cassada* (phonetic) from the Fifth Circuit.  It says:

5       "In evaluating hostile work environment claims, Courts

6            consider the totality of the circumstances, including,

7            quote, 'the frequency of the conduct, its severity, the

8            degree to which the conduct is physically threatening

9            or humiliating, and the degree to which the conduct

10           unreasonably interferes with an employee's work

11           performance.'"

12          I think that this is factually an unusual case.

13  As far as those circumstances go, at least its severity and

14  its humiliating nature suggest that I need to find out more

15  before I might be able to dispose of this as a matter of

16  law.  In particular, discovery as to whether or not Mr. Baty

17  was her supervisor in the sense meant by the statute at hand

18  is going to inform a lot of the analysis because then it

19  would come down to Factor 5.

20          And at this stage, it looks like Texas A&M was

21  acting as a responsible employer and took -- I don't think

22  that there's any disagreement that they took the appropriate

23  action upon the cameras being found.  And then, I would just

24  need to factually look at what could they conceivably have

25  known or should have known beforehand as to Mr. Baty.  And

1   so, I'll be looking at that question again later.

2           But I'm going to deny the Motion to Dismiss and --

3   I felt like that I had something else I wanted to add on

4   that, but I've lost it.  So, that's my ruling, at this

5   point.

6           In terms of -- I do have -- did you want to talk

7   about discovery?

8           MS. AKATUGBA:  Yes.

9           THE COURT:  In terms of discovery, I'd sort of

10  like -- Mr. Taylor?

11          MR. TAYLOR:  Yes, Your Honor.

12          THE COURT:  I am not going to let you litigate

13  this case in the sense of you now want discovery that is so

14  scorched earth and burdensome that you can just wrestle a

15  settlement out of the University.  That's not the way

16  discovery is going to proceed here, and if you all -- with

17  this ruling and with this being a limited problem of civil

18  liability on the University's docket, perhaps you all would

19  like to talk about a reasonable settlement, at this point,

20  but I don't want there to be a sense that the opening round

21  of document requests is now for anything and everything that

22  the University might ever have done in the past as to all

23  sexual harassment Complaints and what is your overall policy

24  as to other areas and units, and this and that and the other

25  thing.  That's not where discovery is going to start.

1          Do you have suggestions on behalf of the

2   University of what discovery, at this juncture, makes sense?

3          MS. AKATUGBA:  So, I think, right off the bat,

4   because this was an environment that had, I think, about

5   50 percent women, 50 percent men, those 50 percent women are

6   potential Plaintiffs and clients of Mr. Taylor.  I think we

7   should limit discovery, in this case, especially since the

8   issue of the supervisor is still up in the area, to the

9   start of Ms. Kraft's employment.  If we're looking at

10  starting when she, you know, began her employment there and

11  during that period, that's the limit because already, in the

12  Complaint, we're seeing allegations going back to 2014 and

13  references to Facebook posts and things like that.  So, I

14  can imagine the scope of this is going to get out of hand.

15  And so, I would like to limit, just at that beginning of

16  this, to the start of her employment and --

17          THE COURT:  When did Mr. Baty begin his

18  employment?

19          MS. AKATUGBA:  I believe --

20          MR. TAYLOR:  He was there for approximately

21  20 years, Your Honor.

22          THE COURT:  Okay.

23          MR. TAYLOR:  And there is actually things that we

24  did put in there because I think the offer, which is such as

25  in 2009, there was references to him by people under him as

1   being "Pervy Pete," P-E-R-V-Y, pervy.

2           THE COURT:  I got you.

3           MR. TAYLOR:  Yeah, and those kind of things, you

4   know, whether the University knew it or not, I think does

5   come into the factor --

6           THE COURT:  So, in terms of what the discovery is,

7   it is the University's position that his employment file as

8   a whole is or is not off-limits, at this point?

9           MS. AKATUGBA:  We are comfortable providing his

10  employment file as a whole.

11          THE COURT:  And so would be -- and that would

12  then, of any Complaints that was made to the University,

13  that would be in his file.  So, you're not saying, "Well,

14  just take his file, but only give stuff from the file

15  forward there."  Okay.

16          MS. AKATUGBA:  Yeah.  And because really the

17  supervisor issue, I think, is ultimately going to dispose of

18  this matter, we'd like to limit other discovery that goes

19  beyond the time she was there who her supervisor was.  So,

20  we are fine providing his employment file --

21          THE COURT:  All right.

22          MS. AKATUGBA:  -- but I think the initial

23  discovery suggestion that Mr. Taylor provided me, it sounded

24  like we would have to go outside even the transportation

25  department where he's never worked outside the

1  transportation department.  He's only worked in this one

2  department.

3          THE COURT:  There's the idea of discovery that

4  Mr. Taylor wants to take and who he can find and et cetera,

5  as opposed to -- it's a different question than discovery

6  directed at the University and then saying you need to go do

7  this huge document request or you need to go do whatever it

8  is, and -- all right.

9          So, I'm ordering that Mr. Baty's employment file

10  will be turned over.

11          And have you all made initial disclosures or have

12  you been waiting on my ruling here?

13          MS. AKATUGBA:  I believe we've been waiting.

14          MR. TAYLOR:  Yes, Your Honor.

15          THE COURT:  Okay.  So --

16          MR. TAYLOR:  We've had conversations, but we

17  haven't --

18          THE COURT:  -- initial disclosures will also

19  proceed.  And I think, probably as part of initial

20  disclosures, the University might have included his

21  employment file as part of that, but regardless, that gets

22  imposed.

23          Mr. Taylor, what are you thinking about in terms

24  of other discovery burdens that you want to put on the

25  University?  What is it that you would be seeking?

1           MR. TAYLOR:  I honestly will do my best not to do

2    extensive discovery because frankly, Judge, I don't want a

3    bunch of documents that I have to spend time with that

4    really don't have any relevance.  What I would look for is

5    -- one of the things, obviously, policies and procedures,

6    which I think they've already sent some to me, but I may be

7    confusing this with another case.

8           What I would think would be pertinent would be the

9    transportation department in particular, but if there's,

10   obviously, any Complaints about him, any Complaints in

11   general.

12          THE COURT:  But that would be, as I understand it,

13   a Complaint like that would make its way into his employment

14   file.

15          Is that right, or do you not know?

16          MS. AKATUGBA:  I'm not sure.  I assume it would.

17   I pulled his employment file, but then we held off on --

18          THE COURT:  Yeah.

19          MS. AKATUGBA:  -- exchanging documents.  So, I

20   honestly didn't go through it.

21          THE COURT:  Okay.

22          MR. TAYLOR:  The other things are, basically --

23   like I said, I will try to keep it very confined to the

24   facts directly involved in this case.  I do believe as far

25   as Mr. Baty's work history -- and I'm not talking about his

1  employment file, but I'm also into how the University

2  classified him for the 20 years he was there.

3           THE COURT:  As a supervisor or --

4           MR. TAYLOR:  Yes, because I believe he was a

5  training supervisor and I believe --

6           THE COURT:  But really whether he's a supervisor

7  or not only matters as to him at the time during her

8  employment.

9           Why would 2005, 2011, why would those dates

10  matter?

11           MR. TAYLOR:  Well, it would show that he's been in

12  that capacity for a long time.  I don't know.  I mean, you

13  know, I'd just like to see the progression --

14           THE COURT:  Well, to the extent that it's in his

15  employment file, that's going to specify what his roles are

16  over time.  I do think -- I mean, the University wasn't

17  opposing discovery as to whether or not he was her

18  supervisor.  So, that discovery is fair game.  Whether, in

19  some metaphysical sense, he was a supervisor of others or

20  before her time there or whatever, it doesn't matter.  It

21  only matters is was he her supervisor.

22           MR. TAYLOR:  Well, Your Honor, that's fine.

23  That'll give me the information regarding --

24           THE COURT:  Okay.

25           MR. TAYLOR:  The only thing I'm looking at, the

1   thing that I would think is compare pay scales, compare --
2   like for example, if he was in the same set of offices where
3   all the other supervisors were, they were divided from where
4   my client was, which would indicate that he had a
5   supervisory capacity.  His threats to write-ups, if he's
6   done any write-ups, I would certainly want that information.
7   But his threats for write-ups and those kind of things,
8   these are all things that what happened during my client's
9   tenure there, that's the kind of thing that I will be
10  looking for.
11          THE COURT:  I guess, I would say this -- it's very
12  abstract.  So, it's very hard for me to set what the
13  discovery limits are going to be, at this point.  The
14  employment file is being turned over.  If there's more that
15  you want that reasonably you would agree to, that's great,
16  but if it gets to the point that what you're asking for the
17  University's position is that's just not relevant to a
18  determination as to whether he's a supervisor and you're
19  able to brief it to me and show me that based on what we've
20  produced, we've showed you that that's all the information
21  that's necessary to determine as to supervisor, I'm not
22  going to allow you to take more.
23          But if it leaves questions or if he's saying, "No,
24  I would need to also see this to understand what's there,"
25  you know, I might allow some supplemental discovery on those

1    issues, but it depends on what's there.

2            MS. AKATUGBA:  I mean, my concern here though is

3    that Title 7 has a very strict definition of supervisor.

4            THE COURT:  Exactly.

5            MS. AKATUGBA:  And so, the fact that he was,

6    quote/unquote, a "training supervisor" and able to issue

7    write-ups and --

8            THE COURT:  No, as I understand it, she's

9    basically, she's a direct report to him and he --

10           MS. AKATUGBA:  She's not a direct report to him.

11           THE COURT:  No, but for Title 7, that's what it

12   would be, right?  She needs to be a direct --

13           MS. AKATUGBA:  No, Title 7 requires that he be

14   able to fire her and terminate her employment.

15           THE COURT:  Oh, okay.

16           MS. AKATUGBA:  And so, I mean, it's very different

17   from the kind of standard way in which we use the term

18   supervisor.

19           THE COURT:  Okay.

20           MS. AKATUGBA:  So, even just a direct report is

21   insufficient, and that wasn't even the case here, but he

22   would have the power to fire her, terminate her, or set her

23   salary.

24           THE COURT:  Okay.

25           MS. AKATUGBA:  And alter her employment

1   conditions, and that's the issue that the University has

2   firmly disputed.

3          MR. TAYLOR:  And if I may, Your Honor?  What I

4   understand it to be comes from a 2013 Supreme Court opinion,

5   *Anthony v. Allstate* (phonetic) and the quotes that they put

6   in there.  He has the authority to effect a significant

7   change in employment status such as hiring, firing, failing

8   to promote, reassignment, with significant different

9   responsibility, or a decision causing a significant change

10  in benefits.

11         THE COURT:  Right, which is, I think, what was

12  said.  And then, I think you all would argue about whether

13  or not he had the capacity to do that as training

14  supervisor, whatever role he was doing.  He could be in with

15  the group of -- thing about it is is the camera, itself, is

16  not something that he was necessarily directing at her as

17  someone he supervised or even that was a direct report to

18  him.  The evidence on that's going to be what it is.  What

19  he did was just basically direct it to the women, as a

20  whole, in that office.  That doesn't -- but the fact that he

21  did that doesn't mean that he has the ability on any

22  particular person, of the women that are using that

23  restroom, that he had a supervisory role over them.  They

24  just happen to be sharing a bathroom in common.

25         Is that -- am I understanding it right?

1        MS. AKATUGBA:  And some men use the bathroom.  It

2   was a single-stall situation.

3        THE COURT:  Okay.

4        MS. AKATUGBA:  So, when you had people who all

5   needed to use the bathroom, it was fair game.  So, it was a

6   single stall lock --

7        THE COURT:  You all are an engineering University,

8   you might want to get another, plumb it for another restroom

9   in there.

10        MR. TAYLOR:  My understanding is that it was a

11   women's restroom.

12        And what I would say to that, Your Honor, is while

13   he may have been aiming it a whole bunch of women, she was

14   working for him and he was aiming it at her, too.

15        THE COURT:  No, no, and that's the thing.  And so,

16   he wasn't aiming it at her because he was her supervisor.

17   He was aiming it at her in concert with aiming it at all

18   other women in the office.  And so, it's a Venn diagram.

19   It's all women, but is she in the group over which he also

20   supervised?  And she may fall within that group, she may

21   not.

22        Okay, all right.  So, I guess, I've made a limited

23   order on what discovery, really initial disclosures, right

24   now, will proceed.  That will include his employment file.

25   You all have my views about what I'm thinking about on

1   discovery right now.

2         To be going back in time on further things that

3   you're going to try to shift a lot of burden onto the

4   University about, I think you're going to have to show me a

5   reason why, in the employment file, you need it.  It's like,

6   "Oh, there's this information here and I don't know what

7   that means.  And so, I need something further as to

8   something that is tangible in his file," or establishing to

9   me, "You know, what's not in his file is 'X' and for me to

10  properly evaluate this claim under the law, I need to see

11  'X'." But I think, you're getting, to my view, a very good

12  starting point by getting his employment file as a whole,

13  which goes back over the entirety of his career.

14         MR. TAYLOR:  And one other thing I want to ask,

15  and I don't know if this is an issue or not, but you know,

16  employment description, like what his job title, if they

17  have an actual description, which I believe some facilities

18  do, some don't, but just having a job description would be

19  helpful.

20         THE COURT:  Well, I would think -- that's either,

21  you know -- they're not going to make up something now

22  *ex post facto* and say, "Here's what his description was."

23  That's not what you want.  And so, if he has a job

24  description --

25         MR. TAYLOR:  Yes, sir.

1        THE COURT:  -- that would be in his employment

2  file.

3        MR. TAYLOR:  Yes.  Okay, thanks.

4        THE COURT:  Okay.

5        MS. AKATUGBA:  So, as part of limiting discovery,

6  we would ask that there's a limit in depositions until that

7  point or we've reached that issue, and we can set a deadline

8  to do all of this, but I would ask that depositions --

9        THE COURT:  Depositions entirely or depositions of

10  Texas A&M personnel?

11        MS. AKATUGBA:  Of Texas A&M personnel be limited

12  to this issue of the supervisory, of whether or not he was a

13  supervisor.

14        THE COURT:  The problem -- see, that helps you,

15  but -- I think that that, as to is he or is he not her

16  supervisor, we necessarily need to resolve that.  So, yes,

17  some quantum of depos as to that goes forward.  But you're

18  arguing that to get to the fifth factor about whether A&M

19  knew or should have known of the harassment and failed to --

20  him not being a supervisor's what brings that into play.

21  And then for you to be able to then move on that for summary

22  judgment, there will need to have been some discovery about

23  what A&M knew or should have known, and that's not just as

24  to his supervisory role.

25        MS. AKATUGBA:  So, I guess what I'm concerned

1   about is that we have written discovery that's limited, but

2   then suddenly, depositions take a turn for what was his

3   nickname in 2004, right?

4           THE COURT:  Uh-huh.

5           MS. AKATUGBA:  And so, this disconnect there --

6   and also, we're still trying to get Mr. Baty into this

7   lawsuit.  I'm not sure, you know, if the Complaint will be

8   amended later because right now, Mr. Baty cannot be held

9   liable under Title 7, which is really the only claim in this

10  Complaint.  And so, to the extent there will be an Amended

11  Complaint later that includes allegations involving

12  Mr. Baty, I guess, I'm just concerned that we will --

13          THE COURT:  Now, that's interesting.  Hold on a

14  second.

15          MR. TAYLOR:  That's not accurate, Your Honor.

16          MS. AKATUGBA:  An individually cannot be held

17  liable --

18          THE COURT:  No, I think that that's -- well, if

19  he's her -- well, I don't know.  If he's her supervisor --

20          MS. AKATUGBA:  The University --

21          THE COURT:  -- that still, that just -- yeah.

22          MR. TAYLOR:  I believe, also, in there, Your

23  Honor, there is some provisions against Mr. Baty

24  individually.

25      (Pause in the proceedings.)

1          THE COURT:  Well, I just flipped it open and in

2     the cause of action, there is just the one cause of action

3     now, but Paragraph 51:

4          "Baty engaged in wrongful tortious actions that were

5              not part of his job description," et cetera.

6          But that's not pleading it as a cause of action to

7     him.

8          Mr. Taylor, do you recall -- see, this was, in

9     part, you were trying to clean this up in good faith

10    following our last hearing.

11         MR. TAYLOR:  Yes, sir.

12         THE COURT:  What causes of action had you stated

13    against Mr. Baty directly in your Original Complaint?  Do

14    you remember?

15         MR. TAYLOR:  Just one second, Your Honor, I'm

16    trying -- I thought that I had had this put in here.  I've

17    got evidence for (indiscernible) in Paragraph 60, the

18    violation of the Texas Penal Code sections.

19         THE COURT:  Okay.  So --

20         MR. TAYLOR:  I thought that there were some other

21    pleadings.  I would probably need to replead as far as

22    Mr. Baty goes.  That was -- there were causes of action in

23    here.  I don't --

24         THE COURT:  No.  And so, do you recall, in your

25    Original Complaint -- because from the last one, there were

1   state tort claims pleaded against the University that were

2   then dismissed without prejudice, did you have -- I just

3   don't have the Original Complaint here.

4          Did you have, you now, Court 3 as negligence

5   versus Baty, Count 4 as negligence per se against Baty, or

6   has it always been balled up like this?

7          MR. TAYLOR:  I think --

8          THE COURT:  What's that?

9          MR. TAYLOR:  I think it was just in the paragraph

10  like that, Your Honor.  I can, like I said, amend just to

11  him and add that back, add that in.  I think there was some

12  more language in there that may have dropped out when we

13  amended this, but I know there are some claims still against

14  him.  I can make them more clear, if you'd rather me do

15  that.

16         THE COURT:  Okay.

17         Ms. Akatugba, what was your point about that going

18  to be?

19         MS. AKATUGBA:  Oh, my point about that is that

20  discovery is limited as far as limited discovery, but then

21  depositions could potentially involve a whole universe of

22  things, and then we get new Complaints.  Who knows what that

23  said?  And then we have new depos, right?  There's a limited

24  amount of depo time.  And so, just making sure that, to the

25  question of the depositions now going forward and addressing

1  this issue, deposition of Mr. Baty and Mr. Baty's

2  supervisor, I think that would be more than sufficient, or

3  the head of the department.  I think three depositions, in

4  this case, of people in the department would be more than

5  sufficient, and I just want an agreement on that before we

6  move forward.

7          THE COURT:  Okay.

8          Mr. Taylor?

9          MR. TAYLOR:  As far as their people, that would

10  probably be sufficient, I think, Your Honor, unless

11  something comes up that one of the people they present was

12  to say, "That's outside my purview."  And you know, as long

13  as they're providing the people that are most knowledgeable,

14  I'm okay with that.

15          As far as other depositions, obviously, we all

16  want Mr. Baty.  If we can get him --

17          THE COURT:  Well, sure but --

18          MR. TAYLOR:  If we can get him in here and get him

19  not under the Fifth Amendment, then we can probably get some

20  answers.

21          I may want to depose co-workers of my client

22  during her time.

23          THE COURT:  Right.

24          MR. TAYLOR:  I'm not sure how many.  I think maybe

25  one or two just to provide background of the environment to

1  support what my client is willing to testify.  I'm assuming

2  they'll want to depose my client, maybe not.  I don't know.

3          THE COURT:  So, as to officials, when you're

4  talking about officials, are we talking about higher-ups?

5  What's the University's position as to if he wants to take

6  depositions of her co-workers at the time?

7          MS. AKATUGBA:  The University's position is to the

8  extent that -- we are fine on the supervisor liability issue

9  and a deposition of one or two co-workers who are still -- a

10  lot of these people are no longer in the University's

11  control.

12          THE COURT:  Okay.

13          MS. AKATUGBA:  No, the nature of this position,

14  it's mostly student workers who come work for financial aid

15  part-time.  And so, a lot of them are no longer -- or

16  they're students.  And so, we would say no to students, for

17  example.

18          So, I really want us to focus on the supervisor

19  issue and I think the best way to get there is Mr. Baty's

20  supervisors and other supervisors -- another supervisor

21  within the department, including Ms. Kraft's supervisor.

22  And I think, that's where we would want to start so we could

23  brief this issue of supervisor liability because I don't

24  think there's a contention here that the University did not

25  take remedial action or that the remedial action --

1          THE COURT:  All right.

2          So, in terms of more senior people at the

3    University, Mr. Taylor, you have an offer of Mr. Baty's

4    supervisor and who they will be saying is Ms. Kraft's

5    supervisor.

6          And you had said perhaps three.

7          MS. AKATUGBA:  Perhaps three.

8          THE COURT:  Who would then the third be?

9          MS. AKATUGBA:  The head of the department.

10          THE COURT:  I assume those two, Mr. Taylor, you do

11    want to take.

12          MR. TAYLOR:  Yes, sir.

13          THE COURT:  Who would the third be of not her co-

14    workers, et cetera, but of a more supervisory or

15    administrative role?

16          MR. TAYLOR:  I'm not sure exactly as far as policy

17    issues go.  We're not getting in -- this is just for the

18    supervisory capacity, correct, Your Honor?

19          THE COURT:  Well, I mean, I think what you want

20    ultimately, on behalf of the University, is to bring an

21    early motion for summary judgment.

22          MS. AKATUGBA:  Correct.

23          THE COURT:  So, that's going to have to be on the

24    knew or should have known issue.

25          All right, let me say this.  At this stage, there

1  will be three depositions of University personnel who are

2  supervisory or administrative in nature.  One will be Baty's

3  supervisor, one will be who the University says was

4  Ms. Kraft's supervisor, and the third will be a supervisor

5  or administrator that Counsel will seek in good faith to

6  identify who that further deposition should be.  And if

7  there's a dispute about that, you can bring it to me, but I

8  think you all will be able to pick a third that covers a lot

9  of what's going on on these issues.

10         And then at this stage, I'm inclined to say that

11  there can be three depositions of Ms. Kraft's co-workers

12  from the time during her employment, and I would say that's

13  as to whether or not they're still currently employed there

14  or not, but there's just three.  Ms. Kraft can identify,

15  "Here's the three best for you to go depose."

16         And let me ask for the University's position on

17  that.  Does that sound -- I don't even think those

18  depositions will be all that long.  Okay, all right.

19         MR. TAYLOR:  One other question along that same

20  line.

21         Would Ms. Kraft be excluded from that?  If I

22  wanted to --

23         THE COURT:  No, no, no.  These are depositions

24  that you're allowed to take, and I assume you don't want to

25  depose your own client.

1          MR. TAYLOR:  Not necessarily, Your Honor.

2          THE COURT:  Yeah.  So, well, I mean, she'll

3  testify at some point, but --

4          MR. TAYLOR:  Yes.

5          THE COURT:  -- you know, you don't need to depose

6  her.  You can put in an affidavit for her, --

7          MR. TAYLOR:  Correct.

8          THE COURT:  -- but they will want to depose her,

9  and that's fine.  Also, I mean, obviously, you're entitled

10  to depose Ms. Kraft, but we'll have to, we'll need to bear

11  in mind whether, you know, I'm going to allow you to depose

12  her twice or just once, et cetera.  And so, we'll bear that

13  in mind.

14          MS. AKATUGBA:  Kind of wish you'd dismissed it,

15  now.

16          THE COURT:  No.  No, I don't actually because I

17  thought about it and it's -- as I said, it's hard to write

18  up that way, and I think it writes up and moves onto

19  different issues after a little bit of discovery.

20          I would like you all also to confer in good faith

21  as to what other discovery is actually necessary on the knew

22  or should have known factor because I would like to get that

23  -- what I would like is that discovery to be done because

24  otherwise, when you move for summary judgment, I'm going to

25  get a response saying, "Here's the other discovery that I

1  need."

2          So, you've got the discovery that I've indicated

3  that you can go forward on.  Confer on the other things.  If

4  you have disputes, bring it to me.

5          And I'm interested in allowing -- the University

6  has to undertake some discovery on this serious incident,

7  but I think the University also deserves to get as

8  expeditiously as possible to a ruling as a matter of law if

9  that's where this case is going, all right?

10          MS. AKATUGBA:  Thank you, Your Honor.

11          THE COURT:  All right, thank you all.

12          MR. TAYLOR:  Thank you, Yor Honor.

13          THE COURT:  Mr. Taylor, thank you very much.

14          I remember you all from the last hearing as well,

15  and I don't regret not getting rid of this case.  I look

16  forward to seeing you all.  But I do, again -- I said it

17  before -- I do commend this one to you to perhaps consider

18  for the potential for a reasonable settlement in the near

19  term.  All right.

20          MR. TAYLOR:  Thank you, Your Honor.

21          THE COURT:  Thank you very much.  We're adjourned.

22  I hope you all have a happy holiday.

23          MR. TAYLOR:  Thank you, Your Honor.

24      (Proceedings adjourned at 11:38 a.m.)

25                      *  *  *  *  *

1          *I certify that the foregoing is a correct*

2    *transcript to the best of my ability produced from the*

3    *electronic sound recording of the proceedings in the above-*

4    *entitled matter.*

5    */S/ MARY D. HENRY*

6    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

8    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9    *JTT TRANSCRIPT #65288*

10   *DATE FILED:  MARCH 24, 2022*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25